*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BARRETT, Minors.

UNPUBLISHED
June 4, 2020

Nos. 349859; 349897; 351314;
351343
Livingston Circuit Court
Family Division
LC No. 18-015854-NA

Before: RONAYNE KRAUSE, P.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

In Docket Nos. 349859 and 349897, respondents appeal by right the trial court's order of disposition, assuming jurisdiction over the children after adjudication by jury trial, as to their son, BB.[1] In Docket No. 351343, respondent-father appeals by right, and respondent-mother argues against,[2] the trial court's order removing BB from their home. In Docket No. 351314, attorney Timothy P. Crawford appeals by right the trial court's order denying his petition to appear as the child's attorney and imposing sanctions for having filed a frivolous pleading. In Docket No. 351314, we remand for the limited purpose of affording Crawford a conditional opportunity to move for reconsideration regarding the reasonableness of sanctions. In all other respects, we affirm. This appeal is being decided without oral argument pursuant to MCR 7.214(E)(1).

---

[1] The proceedings below initially focused primarily on respondent-father's other son, SB. SB is now a few months shy of 18 years old, and respondent-father does not appeal any of the trial court's orders regarding SB. Likewise, SB's mother, who was a respondent below, has not participated in this appeal. Thus, SB is not actually at issue in this appeal, and all references to respondent-mother in this opinion refer only to BB's mother, and unless otherwise specified, "the child" refers to BB.

[2] Respondent-mother appeared as an appellee in Docket No. 351343, but pursuant to MCR 7.216(A)(2), we choose to treat her as having properly appeared as an appellant in that appeal.

-1-

## I. FACTUAL BACKGROUND

Respondent-mother works outside the home and respondent-father is a stay-at-home parent who homeschooled the children and coached them athletically. Respondent-mother is not the mother of respondent-father's older child, SB, and has no legal relationship with him, though she considers him her stepson. The testimony at the 16-day jury trial established that respondent-father subjected SB to increasingly severe mental abuse, and also physical abuse, from 2012 to 2019. Respondent-father took the younger child, BB, who is at issue on appeal, to meetings at which he disparaged SB; and respondent-father also directed BB to videotape his domestic violence against SB.

In 2016, a caseworker identified a risk of harm to both children posed by the home environment. The caseworker testified that respondent-father told the caseworker that she would not be allowed to speak with respondent-mother, and there is no indication in the record that the caseworker actually spoke with respondent-mother. Respondent-father agreed to discontinue physically disciplining SB and to stop picking him up and carrying him, but respondent-father continued to physically restrain and spank SB, despite SB being a teenager by then. Respondents and the children engaged in voluntary counseling, which resulted in a safety plan under which respondent-father would stop carrying SB. However, a youth services administrator testified that respondent-father refused to engage in the safety plan and conflict continued in the home.

Multiple therapists, educators, and service providers testified that respondent-father brought BB with him to meetings at which he disparaged SB. At one meeting, respondent-father talked over SB, and when SB began crying, respondent-father demeaned and degraded him. BB was present, even though the counselor had told respondent-father that BB should not be present. Respondent-father also used BB to validate his behaviors, and therapists testified that this behavior was not appropriate and that it was harmful for BB to be put in the middle of his father and brother.

A juvenile court incorrigibility referee informed respondent-father that he should not continue to attempt to restrain the child, but respondent-father nevertheless continued doing so. The referee also told respondent-father that if there was conflict in the home, respondent-father should have BB leave the room and not be involved in any way, including by videotaping the incidents. Despite this, respondent-father asked BB to videotape his altercations with SB, and informed one caseworker that the child "just knows that's required now." Even at trial, respondent-father testified that he did not think that asking BB to videotape SB was "a major deal."

Respondent-mother testified that the conflict between respondent-father and SB began increasing in the summer of 2018. Neighbors testified about instances during which SB appeared at their homes, upset and in some instances injured. The police were called to respondents' home multiple times, often by respondent-father after conflict had escalated with SB. Respondent-mother had concerns about how the conflict affected BB at times, and spoke with him about the conflict in the home. Respondent-mother sometimes removed BB from physical conflicts between SB and respondent-father where she believed BB might be in physical danger. Respondent-mother testified that she did not think that videotaping the incidents placed BB at a risk of harm.

Throughout the proceedings, respondent-father adamantly refused even to consider any possibility that his own rigid, controlling, aggressive, and violent conduct might be contributing

to the family's strife. Ultimately, after respondent-father continued to refuse to utilize safety plans and services, and as conflict continued in the home, the Department of Health and Human Services (DHHS) petitioned to remove the children from respondents' care. BB was first returned to respondent-mother's care and then also respondent-father's care during the pendency of the trial. Ultimately, a jury found that one or more statutory grounds alleged in the petition had been proven against respondents regarding both children. The trial court ordered SB placed out of the home, but it placed BB with respondents and ordered them to engage in services.[3]

Although she was not particularly cooperative with DHHS, respondent-mother engaged in a domestic abuse intervention program and parenting classes. Respondent-mother admitted that she had stated that she would prefer that DHHS not visit the home, but she understood that it was required. Other than testimony concerning how respondent-mother had requested the DHHS policy concerning home visits, and testimony that respondent-mother told BB that he did not have to speak with DHHS if he did not want to, very little testimony concerned respondent-mother's behavior during the worker's attempts to visit BB. Respondent-mother testified that she had previously cared for BB without respondent-father in the home and that she was willing to engage in any option that returned BB to her home. There was little evidence that respondent-mother personally engaged in the commission of any physical or psychological abuse against SB. However, there was equally little evidence that respondent-mother went to any trouble to try to prevent respondent-father from engaging in the abuse.

In contrast, respondent-father was removed from both domestic violence and parenting programs because he was verbally aggressive and uncooperative with staff. Additionally, respondent-father was actively disruptive during sessions he attended, and he insisted that "he already knew all he needed to know about parenting," despite the significant evidence to the contrary. The caseworker testified about respondent-father's behavior during both attempted home visits, including that respondent-father put the child between himself and the caseworker, shushed respondent-mother, and told the caseworker that the caseworker had "forced entry into [his] home." In September 2019, petitioner sought to remove BB from the home on the basis that the foster care worker was unable to verify the child's well-being because respondents had not allowed the worker to have a private conversation with the child. Ultimately, the trial court determined that BB was at a risk to his mental well-being considering the history of the case and respondents' decision to use him as a "pawn" in their "legal chaos." The trial court ordered BB removed from the home.

## II. ASSUMPTION OF JURISDICTION

Both respondents assert that the trial court clearly erred by assuming jurisdiction over BB. We disagree.

For the trial court to take jurisdiction over a child, the petitioner must prove by a preponderance of the evidence at least one statutory basis for jurisdiction as alleged in the petition. *In re Sanders*, 495 Mich 394, 404-405; 852 NW2d 524 (2014). This Court reviews for clear error the factfinder's verdict regarding jurisdiction over children. See *In re BZ*, 264 Mich App 286, 295;

---

[3] As noted, no party has appealed SB's removal from respondent-father's care.

690 NW2d 505 (2004); *In re Ramsey*, 229 Mich App 310, 314; 581 NW2d 291 (1998). A finding is clearly erroneous if, after reviewing the record, this Court is definitely and firmly convinced that a mistake was made. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010).

One of the circumstances in which the trial court has jurisdiction over a child is when the child "is subject to a substantial risk of harm to his or her mental well-being . . . " MCL 712A.2(b)(1). However, the state may not interfere in a parent's relationship with his or her child merely because the parent is not a "model" parent and does not make perfect parenting decisions. *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982).

"The doctrine of anticipatory neglect recognizes that how a parent treats one child is certainly probative of how that parent may treat other children." *In re AH*, 245 Mich App 77, 84; 627 NW2d 33 (2001) (internal quotation omitted). However, "[t]he fact that there are statutory grounds to assume jurisdiction over one minor child does not automatically mean that there are statutory grounds to assume jurisdiction over a second minor child." *In re Kellogg, Minor*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 349930); slip op at 2. "Yet, even though jurisdiction may be properly assumed on the basis of the anticipatory neglect doctrine, that does not also mean that it will always be sufficient." *Id*. at ___; slip op at 5. "[T]he probative value of such an inference is decreased by differences between the children, such as age and medical conditions." *Id*.

## A. APPLICATION TO RESPONDENT-FATHER

Respondent-father argues that there was insufficient evidence for the trial court to assume jurisdiction over BB as it relates to him because there was no evidence that he abused BB by asking him to videotape conduct that he was already being exposed to in the home. We disagree.

Respondent-father's argument itself recognizes that BB was being exposed to domestic violence in the home, and respondent-father was a significant cause of this conflict. Additionally, respondent-father created a significant risk of harm to BB's mental well-being by taking him to meetings at which he emotionally abused SB. Multiple counselors testified that respondent-father had been told that bringing BB to those meetings was inappropriate, yet he persisted in doing so, reflecting his intransigent unwillingness to consider the effect of his conduct on others. Respondent-father also looked to BB to validate whatever he said about SB, which counselors testified was not appropriate, because it forced BB to choose between his family members. Additionally, relying on his young child for validation reflects a deep insecurity and instability already being inflicted upon BB. Respondent-father was also told by a juvenile court referee not to have BB videotape his conflicts with SB, but, pursuant to his established pattern, he continued to do so, even stating to a caseworker that BB "just knows that's required now." Respondent-father's refusal to utilize safety plans escalated the conflict in the home. Finally, notwithstanding the evidence that BB had not yet suffered any specifically discernable mental harm, BB was beginning to display some of the same disturbing and dangerous tendencies toward misconduct as respondent-father.

Additionally, the doctrine of anticipatory neglect is highly probative under the circumstances. Respondent-father homeschooled and coached both of the children in sports. Most pertinently, there was evidence that, in March 2018, BB attempted to leave an activity while upset,

-4-

but respondent-father picked up and carried BB back to the activity. This behavior was disturbingly similar to how respondent-father treated SB. As noted, respondent-father has consistently refused to entertain any possibility that he even might be any part of the problem. We are not definitely and firmly convinced that the trial court made a mistake when it assumed jurisdiction over BB as it related to respondent-father.

## B. APPLICATION TO RESPONDENT-MOTHER

Respondent-mother argues that the trial court's decision to assume jurisdiction over respondent-mother was clearly erroneous because she actively attempted to remove BB from confrontations and there was no evidence that BB actually suffered harm to his mental well-being. Respondent-mother also argues that evidence of anticipatory neglect is not very probative in her case. We recognize that the evidence as to respondent-mother is less blatant and unambiguous than it is as to respondent-father. Nevertheless, we disagree.

The evidence does not tend to show that respondent-mother directed BB to videotape the violence between SB and respondent-father. However, respondent-mother was disturbingly unconcerned by BB doing so. The fact that respondent-mother removed BB from situations in which she believed BB was at risk of physical harm is commendable. However, she made no effort to prevent respondent-father from inflicting psychological harm upon BB by using BB as a validation tool and using BB as a psychological weapon against SB. We recognize that the doctrine of anticipatory neglect is slightly less probative where BB and SB have different legal relationships to respondent-mother. However, she stated that she considered SB her stepson, and in any event, her disinterest in the physical and mental health of a child who was *de facto* under her care cannot seriously be considered exclusive to a specific child. The sheer extent and egregiousness of respondent-father's behavior precludes any excuse for respondent-mother simply standing by and not only allowing the abuse to happen to SB, but allowing respondent-father to involve BB ever more deeply in that abuse. Respondent-mother may not have contributed to harming the children in quite the same manner as respondent-father, but she was unambiguously a full and equal partner in contributing to the overall toxicity of the household. Although respondent-mother yelling at service providers and police officers may not *per se* constitute unfit behavior, see *Kellogg*, ___ Mich App at ___; slip op at 4, it must be considered in light of the rest of her conduct. In that context, it further suggests that she was likely a less passive participant in abusing the children than it might otherwise seem.

In conclusion, we find no clear error in the trial court's assumption of jurisdiction over both children as to both respondent-mother and respondent-father.

## III. THE CHILD'S TESTIMONY

Respondents argue that the trial court erred by excluding BB from testifying at the jury trial. The trial court excluded BB's testimony because respondents violated its order not to discuss the case in front of BB by taking BB, who was then represented by a LGAL, to discuss the case with respondents' own attorneys. We disagree.

Disallowing a witness is a severe punishment, but the trial court amply considered all of the requisite factors and more before doing so. See *Duray Dev LLC v Perrin*, 288 Mich App 143,

164-165; 792 NW2d 749 (2010). Respondents' violation of the court's order was flagrant and egregious, and there were indications that respondents did so repeatedly. Indeed, respondents had a history of flouting directions from courts, referees, workers, professionals, and essentially everyone else; and in fact, they often actively worked to undermine those directions. Respondents also repeatedly refused to permit BB to speak privately with the lawyer-guardian ad litem. BB's meeting with respondents' attorneys undermined BB's credibility and reliability, and the jury would need to be informed of the meeting. The trial court properly concluded that, under the totality of the circumstances, the most appropriate remedy was to preclude BB from testifying. The trial court also properly instructed the jury not to draw any adverse inference from BB not testifying. See *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). We conclude that the trial court's ruling was proper in light of a problem that respondents knowingly, directly, and unnecessarily created for themselves.

## IV. EXPERT TESTIMONY

Respondent-father argues that the trial court erred by improperly excluding the testimony of a psychologist who would have testified that there had been no harm to BB's mental well-being. We decline to consider whether the trial court improperly excluded this testimony, because we conclude that any error was harmless.

This Court will not reverse on the basis of an evidentiary error unless the error "resulted in a miscarriage of justice." *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010) (quotation omitted). It must appear more likely than not that the error was outcome determinative and undermined the reliability of the verdict, when considered in light of the other evidence. *Id*. Because we find it unlikely that the excluded evidence would have affected the outcome of the proceedings, we need not address whether the exclusion was proper.

Petitioner's theory of the case was not that BB had actually been harmed by respondents' conduct, but that BB was at a significant risk of future harm. Petitioner emphasized that how respondent-father was treating SB was probative of how he would treat BB in the future. Petitioner presented strong evidence of respondent-father's treatment of SB and directly demonstrated that respondent-father had already engaged in that conduct with BB on one occasion. As discussed above, the evidence unambiguously shows that respondent-mother was unwilling to curb respondent-father's harmful conduct and was, at best, simply more subtle at inflicting harm herself. Thus, the gravamen of petitioner's argument was that the past would predict the future, not that the future had already transpired.

The psychologist opined that BB was doing "relatively well" despite some degree of stress and discomfort with aggressive feelings, and "was symptom free, in terms of symptoms or problems that may be apparent to others." The psychologist further opined that although BB had been exposed to potentially distressing events, BB's thinking, mood, and behavior were within a normal range. Nevertheless, as noted, petitioner's theory of the case was not that BB had already sustained any mental harm. Rather, petitioner's theory was that the evidence showed BB *would* be mentally harmed in the future. We do not find it reasonably likely that the outcome of the case would have differed had evidence been presented that BB had not yet suffered any mental harm, a fact not meaningfully disputed.

## V. REMOVAL

Respondents argue that the trial court clearly erred when it determined that there were circumstances to warrant an emergency removal of BB from the home. We disagree that removal was unwarranted.

Generally, this Court reviews for clear error the trial court's findings of fact during child protective proceedings. *Mason*, 486 Mich at 152. A finding is clearly erroneous if, after reviewing the record, this Court is definitely and firmly convinced that a mistake was made. *Id*.

The trial court did not issue an emergency order of removal. A trial court may remove a child from the home "through the use of an order before or after an emergency removal, at the preliminary hearing, or at a dispositional review hearing." *In re McCarrick/Lamoreaux*, 307 Mich App 436, 459; 861 NW2d 303 (2014) (citations omitted). Immediate removal is warranted when exigent circumstances require immediate action. *Sanders*, 495 Mich at 406 n 3. In contrast, MCR 3.974(B)(2) provides that if the child is under the jurisdiction of the court, the trial court may order the child removed from the home if a supplemental petition is filed, the court conducts a hearing on the petition, and the parents are given notice and a hearing. MCR 3.974(B)(2). In this case, petitioner filed a supplemental petition seeking to remove BB from respondents' care. Thus, this case did not concern an emergency removal, so we will not consider any argument premised on an emergency removal.

A trial court may order a CPS worker to take a child into protective custody after finding that (1) "[t]he child is at substantial risk of harm or is in surroundings that present an imminent risk of harm and the child's immediate removal from those surroundings is necessary to protect the child's health and safety," (2) the circumstances warrant issuing an order under MCR 3.974(C) if the child is under the court's jurisdiction, (3) reasonable efforts were made to prevent the child's removal, (4) no other remedy than protective custody will protect the child, and (5) continuing to reside in the home is contrary to the child's welfare. MCR 3.963(B)(1)(a) to (e).

In this case, petitioner sought to remove the child from respondents' care because they were not allowing DHHS to ensure BB's safety and well-being. The caseworker testified that respondent-father would not allow him to interview BB alone. Respondent-mother again seems to have been less direct, although she did advise BB that he did not need to speak to the worker if he did not want to. One of the major concerns in this case was suspected mental abuse and combative behavior between respondent-father and SB, and the trial court directly observed that BB was mimicking respondent-father's "hostile, aggressive, disruptive, combative, uncooperative behavior" at a court hearing. Thus, there was substantiated cause for concern as to BB's psychological safety. As noted, respondent-mother was clearly complicit.

Additionally, respondent-father was not following his case service plan. When a parent fails to participate in a service plan, it provides evidence that the parent cannot properly care for the child and that the child may be harmed in the parent's home. See *In re White*, 303 Mich App 701, 710-711; 846 NW2d 61 (2014). Respondent-father was removed from domestic abuse intervention and parenting class services because of his verbal aggression and refusal to cooperate with those programs. Respondent-father's refusal to engage in services designed to address the risk of harm to BB was evidence that the child was at a risk of harm if he stayed in respondent-

father's home. Once again, respondent-mother was somewhat less arrogant, defiant, and brazenly disruptive than respondent-father. However, the record shows that she was an equal participant in attempting to undermine court orders and directives or advice from workers, and, as noted, she was clearly complicit in the abuse of both children. Under the exceptional circumstances of this appalling case, respondent-mother's own misconduct is simply too intertwined with respondent-father's misconduct to disentangle, even if we were to presume that it was arguably less egregious. We conclude that the trial court did not clearly err by removing BB from respondents' care.

## VI. ATTORNEY SANCTIONS

Attorney Crawford argues that the trial court clearly erred by sanctioning him on the basis that he did not conduct a factual inquiry before petitioning to represent the child, and on the basis that his petition was not supported by law. Crawford additionally argues that the trial court violated his right to due process by imposing attorney fees on him without a hearing. We affirm the trial court's decision to sanction Crawford for his unauthorized appearance as the child's attorney, but we remand for a limited and conditional opportunity for Crawford to challenge the amount of the fee award.

This Court reviews for clear error a trial court's finding regarding whether a claim is frivolous. *Kitchen v Kitchen*, 465 Mich 654, 661; 641 NW2d 245 (2002). This Court reviews for an abuse of discretion the trial court's award of attorney fees and costs. *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008). The trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*.

When an attorney signs a document, the attorney certifies that (1) he or she has read the document, (2) to the best of the person's knowledge "formed after a reasonable inquiry," the document is well-grounded in fact and "warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law," and (3) the purpose of the document is not improper. MCR 1.109(E)(5). The trial court shall sanction a party for violating this rule, and the sanction "may include an order to pay the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees." MCR 1.109(E)(6).

An attorney commits misconduct by purporting to be the attorney for a minor child when he or she is not. *In re Shaffer*, 213 Mich App 429, 436-437; 540 NW2d 706 (1995). The proper procedure is for an attorney to petition to represent a child *without* entering an unauthorized appearance. *Id*. at 437. "Only if such a petition is granted should [an attorney] purport to represent itself as an attorney at law for a minor." *Id*. In this case, Crawford filed a motion that stated: "NOW COMES [BB], by and through his attorneys, KARLSTROM COONEY, LLP." Because caselaw clearly states that a person shall not make an unauthorized appearance on behalf of a child before petitioning to represent the child, Crawford's motion was not warranted by existing law.

We affirm the trial court's decision because we agree with its finding that Crawford's motion was not warranted by existing law.[4]

However, the trial court awarded the guardian ad litem attorney fees without affording Crawford the opportunity for a hearing. Due process requires that a party receive notice of the proceedings against it and a meaningful opportunity to be heard. *Al-Maliki v LaGrant*, 286 Mich App 483, 485; 781 NW2d 853 (2009). The essence of due process requires fundamental fairness. *Id*. "Where a court considers an issue sua sponte, due process can be satisfied by affording a party an opportunity for rehearing." *Id*. at 485-486. The trial court must hold an evidentiary hearing when an amount of attorney fees is challenged if a party timely requests it. *Peterson v Fertel*, 283 Mich App 232, 242; 770 NW2d 47 (2009). We disagree that Crawford was necessarily entitled to formal written notice of the hearing at which the trial court ruled on the request for sanctions. However, we agree that Crawford was entitled to actual notice sufficient to permit him to show up to the hearing, irrespective of how that notice came to be communicated.

Crawford was aware of the LGAL's request for attorney fees and argued against a fee award. However, the trial court ruled on Crawford's motion to be appointed counsel for BB and then asked Crawford "to bow out here now" in the middle of a review hearing. It was not until the very end of the hearing, after being reminded by the LGAL, that the trial court stated it would take the attorney fee request under advisement and scheduled a followup hearing. We note that the lower court register of actions does not indicate that notice of the followup hearing was filed or served on anyone.

The transcript of the review hearing does not indicate whether Crawford actually left the courtroom after being asked to "bow out," although it does show that he had no further direct involvement in the proceedings. We do not construe the trial court's statement as a requirement to leave the courtroom, only to leave the case. If Crawford remained in the courtroom until the end of the hearing, then he was actually aware of the followup hearing. In that case, he received constitutionally adequate actual notice, and his absence from the followup hearing was his own choice and constitutes a waiver. If Crawford left the courtroom but was told about the followup hearing by someone, perhaps respondents, then he again received constitutionally adequate notice and waived his right to challenge the sanctions by failing to show up. However, if Crawford left the courtroom and nobody bothered to tell him about the followup hearing, then we would agree that Crawford was deprived of his constitutional right to notice and an opportunity to be heard.

---

[4] We find it to be a closer question whether Crawford made a sufficient factual inquiry before filing his motion. Petitioning to be appointed legal counsel for a child is not, itself, necessarily improper. *In re Shaffer*, 213 Mich App at 436-437. Crawford clearly engaged in some investigation, including reviewing recordings and speaking with BB. We are skeptical whether Crawford understood that by becoming involved, he was wading into respondents' self-dug cesspit of manipulation and flouting the trial court. The trial court also wondered, reasonably, whether Crawford had "any idea what [he] just stepped into." We might be inclined to give Crawford the benefit of the doubt that he is simply another of respondents' victims, but the trial court had a better opportunity to observe the demeanor of the parties, so we decline to find error in its holding. *McGonegal v McGonegal*, 46 Mich 66, 67; 8 NW 724 (1881).

On this record, we are unable to determine what occurred, and the trial court's rejection of Crawford's motion for being void is unhelpful.

Therefore, we must remand this matter for the limited purpose of granting Crawford a conditional opportunity to file a motion for reconsideration of the amount of sanctions. If Crawford avails himself of that opportunity, the trial court shall first determine whether Crawford actually had advance knowledge of the hearing at which the court ruled on the amount of sanctions. If Crawford did have such actual advance knowledge, via any means or for any reason, the court shall deny Crawford's motion. Furthermore, Crawford may *only* challenge the *amount* of sanctions, because as discussed above, the imposition of sanctions itself is mandatory. MCR 1.109(E). We impose no other restrictions or conditions on how the trial court should resolve the motion.

## VII. CONCLUSIONS

In Docket No. 351314, we affirm the imposition of sanctions, but we remand for the limited and conditional purpose of permitting Crawford to file a motion for reconsideration of the amount only of sanctions imposed by the trial court, as described above. We retain jurisdiction in Docket No. 351314 only.

In Docket Nos. 349859, 349897, and 354343, we affirm.

/s/ Amy Ronayne Krause
/s/ Deborah A. Servitto
/s/ James Robert Redford

-10-

# Court of Appeals, State of Michigan

## ORDER

In re Barrett Minors

Docket No.    351314

LC No.        18-015854-NA

Amy Ronayne Krause
Presiding Judge

Deborah A. Servitto

James Robert Redford
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. Specifically, the remand is limited to permitting attorney Timothy Crawford to file a motion for reconsideration as to the *amount* of sanctions imposed on him for filing a frivolous motion. We retain jurisdiction.

Attorney Crawford shall file his motion in the trial court or notice that he elects to waive the opportunity to file the motion within 28 days of the Clerk's certification of this order, and the proceedings on remand shall thereafter be given priority until they are concluded. The proceedings on remand are limited to the issue stated in the opinion.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

June 4, 2020
Date

Chief Clerk